**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Edison Co.,* Slip Opinion No. 2019-Ohio-2401.]**

<u>NOTICE</u>

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-2401

IN RE APPLICATION OF OHIO EDISON COMPANY, CLEVELAND ELECTRIC ILLUMINATING COMPANY, AND TOLEDO EDISON COMPANY FOR AUTHORITY TO PROVIDE FOR A STANDARD SERVICE OFFER PURSUANT TO R.C. 4928.143 IN THE FORM OF AN ELECTRIC SECURITY PLAN;

SIERRA CLUB ET AL., APPELLANTS; PUBLIC UTILITIES COMMISSION, APPELLEE; OHIO EDISON COMPANY ET AL., INTERVENING APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Edison Co.,* Slip Opinion No. 2019-Ohio-2401.]**

*Public utilities—Electric-security plan—R.C. 4928.143—Commission's determination that distribution modernization rider constituted an incentive under R.C. 4928.(B)(2)(h) was unlawful and unreasonable—Order affirmed in part and reversed in part and cause remanded.*

(Nos. 2017-1444 and 2017-1664—Submitted January 9, 2019—Decided June 19, 2019.)

APPEAL from the Public Utilities Commission, No. 14-1297-EL-SSO.

---

**DONNELLY, J.**

{¶ 1} This cause originates from an order of the Public Utilities Commission of Ohio ("commission" or "PUCO") that modified and approved an electric-security plan ("ESP") for the FirstEnergy Companies (Ohio Edison Company, The Cleveland Electric Illuminating Company, and The Toledo Edison Company) (collectively "FirstEnergy" or the "companies"). The central issue before this court is the commission's modification of the ESP to add a distribution modernization rider[1] ("DMR") that was not part of the original application and allows the companies to collect what they estimate to be $168 to 204 million in extra revenue per year. The commission concluded that the DMR was valid under R.C. 4928.143(B)(2)(h) because the revenue it generated would purportedly serve as an incentive for the companies to modernize their distribution systems. Nineteen parties appealed,[2] challenging the addition of the DMR and other aspects of the commission's order approving the ESP.

{¶ 2} For the reasons that follow, we affirm the commission's order in part, reverse it in part as it relates to the DMR, and remand with instruction to remove the DMR from FirstEnergy's ESP.

## I.     Facts and Procedural History

{¶ 3} R.C. 4928.141(A) requires electric-distribution utilities to make a "standard service offer" of generation service to consumers in one of two ways: through a "market rate offer" (under R.C. 4928.142) or an ESP (under R.C. 4928.143). In early 2016, the commission approved the fourth ESP of the

---

[1] A rider is a temporary, additional charge that is separate from the basic monthly rates.
[2] Appellants include the Northeast Ohio Public Energy Council ("NOPEC"), Sierra Club ("Sierra"), Ohio Manufacturers' Association Energy Group ("OMAEG"), Ohio Environmental Council, Environmental Defense Fund, and Environmental Law and Policy Center (collectively the "Environmental Groups"), and the Office of the Ohio Consumers' Counsel, Northwest Ohio Aggregation Coalition, and its individual member communities (collectively "OCC").

companies. *In re Application of Ohio Edison Company*, Pub. Util. Comm. No. 14-1297-EL-SSO (March 31, 2016) ("ESP Order"). As part of the ESP, the commission authorized a Retail Rate Stability Rider ("Rider RRS"). Rider RRS was proposed as a generation charge that was intended to protect ratepayers from price volatility. Specifically, it was designed to stabilize retail customer rates by providing a financial hedge—a type of insurance—against fluctuating wholesale power prices.

{¶ 4} Less than a month after the commission issued the ESP Order, the Federal Energy Regulatory Commission ("FERC") rescinded a waiver on affiliate power-sales restrictions previously granted to FirstEnergy Solutions, an affiliate of the companies. *Elec. Power Supply Assn. v. FirstEnergy Solutions Corp.*, 155 FERC ¶ 61, 101 (April 27, 2016). As a result, several parties filed applications for rehearing in the ESP case requesting the commission to, among other things, consider the impact of the FERC order on Rider RRS. *See* R.C. 4903.10. The commission granted rehearing.

{¶ 5} On June 29, 2016, the commission's staff proposed that the commission adopt the DMR as an alternative to Rider RRS. The commission's staff was concerned that Rider RRS could be construed as an unlawful transition charge and could also conflict with FERC's authority over wholesale power markets. In addition, staff believed that the DMR would serve as an incentive for the companies to upgrade and modernize their distribution systems.

{¶ 6} By October 12, 2016, the commission had issued its fifth rehearing entry, which eliminated Rider RRS from the ESP. In its place, the commission authorized the companies to implement the DMR. The commission initially authorized the companies to collect $132.5 million annually for three years under the DMR. The commission then ordered that the DMR be adjusted upward to account for federal corporate income taxes, which raised the annual recovery to approximately $204 million. With the passage of the Tax Cuts and Jobs Act of

2017—which reduced the federal corporate income tax rate from 35 percent to 21 percent—this amount was ultimately lowered to an estimated $168 million for 2018 and 2019. *In re Application of Ohio Edison Co.*, Pub. Util. Comm. No. 17-2280-EL-RDR, 2018 Ohio PUC LEXIS 203 (Feb. 28, 2018).

{¶ 7} After four more rounds of rehearing, the commission issued a final, appealable order on October 11, 2017. Appellants then filed these appeals, challenging the commission's decision to approve the ESP. FirstEnergy and Ohio Energy Group have intervened as appellees in support of the commission's decision.

## II.    Standard of Review

{¶ 8} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The "appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record." *Id.*

{¶ 9} Although the court has "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law when "highly specialized issues" are involved and when "agency expertise would, therefore, be of assistance in

4

discerning the presumed intent of our General Assembly," *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

### III.    Analysis

{¶ 10} Together, appellants raise 25 propositions of law.  The main challenges are to the DMR, so we address them first.

### A. Whether the commission erred in approving the DMR under R.C. 4928.143(B)(2)(h):
### Sierra Propositions of Law Nos. 1-3; Environmental Groups Propositions of Law Nos. 1-3; OCC Proposition of Law No. 1; OMAEG Proposition of Law No. 4; NOPEC Propositions of Law Nos. 1-2

{¶ 11} As noted, during the rehearing process, the commission's staff proposed the DMR as an alternative to Rider RRS.  The staff intended the DMR to provide FirstEnergy Corporation, through the companies, with funds to improve its credit rating and assure continued access to credit on reasonable terms, which would then allow FirstEnergy Corporation to borrow adequate capital to support the companies' grid-modernization initiatives.  According to its staff, the commission could approve the DMR under R.C. 4928.143(B)(2)(h), which allows for:

> Provisions regarding the utility's distribution service, including, without limitation and notwithstanding any provision of Title XLIX of the Revised Code to the contrary, * * * provisions regarding distribution infrastructure and modernization incentives for the electric distribution utility.

{¶ 12} The commission agreed with its staff and found that this section authorized the DMR as a "provision[] regarding distribution infrastructure and modernization incentives for the electric distribution utility."  Pub. Util. Comm.

No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 127 (Oct. 12, 2016). The commission found that the "testimony demonstrates that Staff intends for Rider DMR to jump start the Companies' grid modernization efforts." *Id.* at ¶ 190. According to the commission, "the record demonstrates that Rider DMR is intended to stimulate the Companies to focus their innovation and resources on modernizing their distribution systems." *Id.*

{¶ 13} Appellants collectively raise several challenges to the commission's determination that the DMR is a lawful component of an ESP under R.C. 4928.143(B)(2)(h). The following two of appellants' arguments are well-taken.

**1. The DMR does not qualify as an incentive under R.C. 4928.143(B)(2)(h)**

{¶ 14} Appellants argue that the DMR does not qualify as a proper incentive under R.C. 4928.143(B)(2)(h) because it does not require the companies to take any action in exchange for receiving the DMR funds. According to appellants, the DMR does not jump-start the companies' grid-modernization efforts because it does not compensate the companies for investing in distribution-modernization projects, require them to undertake any modernization projects, or require them to complete any such projects within a specified time period. After review, we find that the DMR does not serve as an incentive within the meaning of the statute.

{¶ 15} The commission relied on a dictionary definition of " 'incentive,' " as " 'something that stimulates one to take action, work harder, etc.; stimulus; encouragement.' " Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 190 (Oct. 12, 2016), quoting *Webster's New World Dictionary* 682 (3d College Ed.1988). The commission found that under its preferred definition, the DMR qualified as an incentive under R.C. 4928.143(B)(2)(h) because the rider "is intended to stimulate the Companies to focus their innovation and resources on modernizing their distribution systems." *Id.* at ¶ 190.

{¶ 16} Although the commission defined incentive, it did not explain how the DMR operates as an incentive. An incentive generally serves to induce

someone to take some action that otherwise would not be taken but for the incentive. Moreover, the DMR is a financial incentive and "it is inherent in an incentive payment that the recipient must do something to be paid." *Len Stoler, Inc. v. Volkswagen Group of America, Inc.*, 232 F.Supp.3d 813, 822 (E.D.Va.2017). That is, the payment of a monetary incentive is generally conditioned upon completion of a particular action.

{¶ 17} In the context of public-utility regulation, cost-based ratemaking already ensures that the utility will recover its prudently incurred costs of providing service plus a fair rate of return on its capital investments (such as power plants or distribution systems). R.C. 4909.15(A); *Babbit v. Pub. Util. Comm.*, 59 Ohio St.2d 81, 90, 391 N.E.2d 1376 (1979). In contrast, incentive ratemaking uses rewards and penalties that link utility revenues to various standards or goals. For instance, in the ESP Order, the commission had originally approved a 50-basis-point adder to the return on equity in another rider, the Advanced Metering Infrastructure Rider ("Rider AMI"). The commission approved Rider AMI as the mechanism through which FirstEnergy would recover capital expenditures and other distribution-infrastructure investments. The 50-basis-point adder would have provided additional recovery above the companies' incurred costs as an incentive for any investments made for grid modernization in Ohio. The commission also required each company to include a timeline for when it would achieve full smart-meter installation as part of its grid-modernization efforts.

{¶ 18} On rehearing, the commission replaced the 50-point adder with the DMR. As noted, the DMR was designed to provide credit support for the FirstEnergy Corporation—through the companies—so it could borrow capital on more reasonable terms in order to support its grid-modernization initiatives. In finding that the DMR is an incentive, the commission relied solely on its staff's intent "for Rider DMR to jump start the Companies' grid modernization efforts." But the commission pointed to nothing in the record that demonstrates how this

cash infusion incentivizes FirstEnergy to accomplish that goal. The companies will already recover the costs of any future grid-modernization projects under Rider AMI, so the DMR would provide additional revenue beyond what the companies would recover for modernizing their distribution systems. The critical problem is that the companies are not *required* to make any investments to modernize the distribution grid in exchange for DMR revenues. Unlike the 50-point adder, the DMR includes no directives or timelines regarding specific distribution-modernization projects. And in fact, the commission made it clear that there are no plans for FirstEnergy to take on any modernization projects in the immediate future. Nor did the commission place any effective condition or penalty on the companies' receipt of revenues if the DMR funds did not serve the intended purpose. The commission simply authorized the companies to receive DMR funds up front before any infrastructure-improvement projects were undertaken or completed, removing any effective incentive for FirstEnergy to use the DMR funds to modernize its infrastructure.

{¶ 19} We generally defer to the commission's interpretations on rate-related statutory provisions, but only if they are reasonable. *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 29. The commission's finding that the DMR operates as an incentive under R.C. 4928.143(B)(2)(h) is both unlawful and unreasonable because it lacks evidence and sound reasoning. The commission relied solely on rehearing testimony demonstrating that its staff *intends* for the DMR to jump-start the companies' grid-modernization efforts. But the PUCO staff's intent does not explain how the DMR will encourage the companies to invest in distribution modernization. Utility companies can be expected to respond to financial motivations, but not if the commission awards them money up front with no meaningful conditions attached. Although the DMR may make it possible for FirstEnergy to obtain capital for future infrastructure investment on more favorable credit terms, the evidence cited does

8

not support the commission's finding that the DMR qualifies as an incentive under R.C. 4928.143(B)(2)(h). The PUCO staff's wishful thinking cannot take the place of real requirements, restrictions, or conditions imposed by the commission for the use of DMR funds.

## 2. The conditions placed on the recovery of DMR revenue are not sufficient to protect ratepayers

{¶ 20} The commission conditioned recovery of DMR revenue on (1) FirstEnergy Corporation keeping its corporate headquarters and nexus of operations in Akron, (2) no change in the "control" of the companies as that term is defined in R.C. 4905.402(A)(1), and (3) a demonstration of sufficient progress in implementing and deploying grid-modernization programs approved by the commission.

{¶ 21} Appellants challenge those conditions as meaningless and failing to protect ratepayers. FirstEnergy counters that the conditions placed on the receipt and use of DMR revenue ensure that it will be used to jump-start distribution-grid-modernization initiatives. As FirstEnergy sees it, these conditions ensure that the DMR operates as an incentive and not a gift to the companies.

{¶ 22} We agree with appellants that there are no discernable consequences or repercussions if FirstEnergy fails to comply with the conditions imposed for receiving DMR funds. Ostensibly, FirstEnergy would forfeit the DMR if it failed to comply with any of the conditions. But FirstEnergy has been recovering DMR revenue since January 1, 2017, and the commission did not make the DMR subject to refund if FirstEnergy does not meet the required conditions.

{¶ 23} Moreover, despite our finding that the DMR is unlawful, no refund is available to ratepayers for money already recovered under the rider. R.C. 4905.32 bars any refund of recovered rates unless the tariff applicable to those rates sets forth a refund mechanism. *In re Rev. of Alternative Energy Rider Contained in Tariffs of Ohio Edison Co.*, 153 Ohio St.3d 289, 2018-Ohio-229, 106 N.E.3d 1,

¶ 15-20.    FirstEnergy's tariffs for the DMR, however, contain no refund mechanism.

### a. The commission's audit review of DMR expenditures is not helpful

{¶ 24} The commission did direct its staff to periodically review how the companies and FirstEnergy Corporation use the DMR funds to ensure that such funds are used, directly or indirectly, in support of grid modernization.   On rehearing, the commission clarified that its review will be "ongoing and conducted in real time."  And to assist in this review, the commission directed its staff to retain a third-party monitor to ensure that DMR funds are expended appropriately.  Those reviews, however, do not sufficiently protect ratepayers from possible misuse of DMR funds.

{¶ 25} On December 11, 2017, the commission opened up a docket to review FirstEnergy's DMR charges and expenditures.  The commission appointed Oxford Advisors, L.L.C., as the third-party monitor to review FirstEnergy's use of DMR funds.   The commission directed Oxford to submit periodic reports documenting whether the companies have implemented the DMR in compliance with its prior orders.  Specifically, Oxford is required to submit quarterly updates to the PUCO staff on the use of DMR funds, a midterm report in the event that the companies seek to extend the DMR beyond its initial three-year term, and a final report within 90 days of the termination of the DMR.

{¶ 26} Although the commission authorized any participant in the proceeding to examine Oxford's conclusions, results, and recommendations, those reports will not be available to the parties until they are filed with the commission. This will not occur, however, until FirstEnergy seeks to either extend or terminate the DMR, and so it appears that the parties will not be able to challenge Oxford's findings until well after the DMR funds have been recovered and spent.  Thus, it is not clear what remedy would be available should the commission (or this court on appeal) find that FirstEnergy has misused DMR funds.

**b. The commission's PowerForward initiative delays the implementation of FirstEnergy's grid-modernization plan**

{¶ 27} The commission also conditioned FirstEnergy's receipt of DMR funds on a demonstration of sufficient progress in the implementation and deployment of commission-approved grid-modernization programs. But this condition is essentially meaningless because the commission set up a process in which no projects will be approved until after the commission has completed its PowerForward initiative. PowerForward is a roadmap for the future of electric distribution utility service in Ohio and includes grid modernization as a key component. The commission completed the PowerForward roadmap on August 29, 2018, and is in the process of implementing it through partnerships with Ohio stakeholders and national experts. *See* www.puco.ohio.gov/industry-information/industry-topics/powerforward/ (accessed June 17, 2019).

{¶ 28} The companies did file an application on February 29, 2016, opening up the *FirstEnergy Grid Modernization Business Plan*, Pub. Util. Comm. No. 16-481-EL-UNC. But the commission will take no action in this docket until after it completes the PowerForward initiative. Because the DMR was initially approved for only three years—ending in 2019 unless extended—it is possible, if not likely, that the companies will recover most, if not all, of the DMR revenue before the commission approves any modernization projects for the companies.

{¶ 29} In the end, these conditions on the DMR contain no consequences—and offer no protection to ratepayers—if FirstEnergy fails to honor them. Given the foregoing, we reverse the commission's determination that the DMR constitutes an incentive under R.C. 4928.143(B)(2)(h). On remand, the commission should remove the DMR from FirstEnergy's ESP.

**B. Whether the commission erred in approving the DMR on additional grounds:**

**OMAEG Propositions of Law Nos. 5, 6, and 8; NOPEC Proposition of Law No. 3; Environmental Groups Proposition of Law No. 1**

{¶ 30} Appellants raise several other challenges to the commission's determination that the DMR is lawful under R.C. 4928.143. Appellants contend that the DMR is unlawful because its purpose of providing credit support is not contemplated in any of the nine permissible categories under R.C. 4928.143(B)(2) and it lacks an adequate nexus to the provision of distribution service as required by R.C. 4928.143(B)(2)(h). Appellants also maintain that the DMR violates the prohibition against unlawful transition revenue under R.C. 4928.38, fails to advance state electric policies under R.C. 4928.02, and imposes unjust, unreasonable, and unlawful rates in violation of R.C. 4905.22.

{¶ 31} In view of our decision to reverse the commission on the incentive-ratemaking finding and DMR conditions, we need not reach these other matters. Accordingly, we dismiss these arguments as moot. *See In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, at ¶ 39.

**C. Whether the commission erred in excluding the DMR from the significantly-excessive-earnings test, R.C. 4928.143(F):**

**OCC Proposition of Law No. 2; OMAEG Proposition of Law No. 7**

{¶ 32} Appellants argue that the commission erred when it excluded DMR revenues from the significantly-excessive-earnings test ("SEET"). Electric-distribution utilities that opt to provide service under an ESP must undergo an annual earnings review. R.C. 4928.143(F) requires the commission to consider annually whether the plan resulted in significantly excessive earnings compared to companies facing comparable risk. If the ESP resulted in significantly excessive earnings, the utility must return the excess to its customers. R.C. 4928.143(F). In

the proceedings below, the commission found that "DMR revenues should be excluded from SEET calculations." Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 212 (Oct. 12, 2016).

{¶ 33} The commission stated on rehearing that the challenges to the SEET determination in this case are premature, implying that they can be raised in the next SEET proceeding. The fact that there is "ample opportunity later to bring [a] legal challenge at a time when harm is more imminent and more certain," *Ohio Forestry Assn., Inc. v. Sierra Club*, 523 U.S. 726, 734, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), supports withholding review at this time. *See also Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 32 (finding no prejudice stemming from commission's order when the order had no ratemaking effect and parties could challenge the recovery of deferred expenses in next rate case).

{¶ 34} Further, utility customers will not be prejudiced by the failure to immediately address the issue. R.C. 4928.143(F) expressly provides for customer refunds if the ESP resulted in significantly excessive earnings, but that determination can be made only in a SEET proceeding. Appellants have failed to demonstrate that deferring review at this time will result in real harm. Accordingly, we decline to address the SEET issue at this time.

### D. Whether the commission properly conducted the statutory test for approving an ESP under R.C. 4928.143(C)(1):

### OCC Proposition of Law No. 4; NOPEC Proposition of Law No. 4

{¶ 35} R.C. 4928.143(C)(1) requires the commission to approve an ESP if it is "more favorable in the aggregate" than the expected result of a market-rate offer. The statute, however, "does not bind the commission to a strict price comparison." *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 402, 2011-Ohio-958, 945 N.E.2d 501, ¶ 27. Instead, "in evaluating the favorability of a

plan, the statute instructs the commission to consider 'pricing and all other terms and conditions.' " (Emphasis deleted.) *Id.*, quoting R.C. 4928.143(C)(1).

{¶ 36} Appellants argue that the commission improperly applied the statutory test by excluding the costs of the DMR and another ESP rider—the Government Directive Recovery Rider—when it weighed the ESP against the market-rate offer. We affirm the commission on this issue for the following reasons.

### 1. We need not decide whether the commission erred in refusing to consider DMR revenues under the statutory test

{¶ 37} Appellants first argue that the commission unlawfully failed to consider the costs of the DMR when it conducted the statutory test under R.C. 4928.143(C)(1). The commission did not weigh the costs of the DMR to ratepayers under the statutory test because it determined that the same amount of revenue could be recovered by the companies from ratepayers had the companies sought a market-rate offer under R.C. 4928.142 rather than an ESP. Although we question the commission's interpretation of R.C. 4928.142 to exclude the DMR revenues under the ESP-versus-market-rate-offer test, our decision holding that the DMR is unlawful renders this issue moot.

### 2. The commission did not err in refusing to consider the costs of the Government Directive Recovery Rider under the statutory test

{¶ 38} Appellants also fault the commission for not considering the costs of the Government Directive Recovery Rider when it conducted the ESP-versus-market-rate-offer test. The purpose of the Government Directive Recovery Rider was to allow the companies to recover future unforeseen costs that were required by federal or state mandates. No costs were to be included in the rider until (1) the companies incurred actual costs for complying with the government mandates, and (2) the commission deemed the costs were prudently incurred in a separate proceeding.

**{¶ 39}** We have upheld the commission's decision to exclude no-cost or placeholder riders from the statutory test when, as here, no costs are recovered under the rider during the ESP term. *In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, ¶ 37. Accordingly, we reject appellants' argument.

**E. Whether the commission erred when it found that the companies could withdraw the ESP in response to a mandate from this court: OCC Proposition of Law No. 3**

**{¶ 40}** OCC argues that the commission erred in finding that R.C. 4928.143(C) allowed FirstEnergy to withdraw and terminate its ESP in response to a court-ordered modification on appeal. R.C. 4928.143(C)(1) requires the commission to "approve," "modify and approve," or "disapprove" an ESP application. "If the commission modifies and approves an application," the "utility may withdraw the application, thereby terminating it, and may file a new standard service offer." R.C. 4928.143(C)(2)(a). On rehearing, the commission found that the companies' right to withdraw and terminate an ESP application does not lapse until the conclusion of the rehearing process and appellate review. OCC maintains that the companies have a limited right to withdraw under R.C. 4928.143(C)(2)(a) and that allowing an electric utility to withdraw and terminate the ESP in response to a court decision reversing a commission order would circumvent this court's authority to review commission orders under R.C. 4903.13.

**{¶ 41}** FirstEnergy, however, has not withdrawn its ESP at this time. Hence, whether the companies may collect ESP rates for some period of time and then withdraw the ESP following an adverse ruling on appeal is a hypothetical question. Because the question is purely hypothetical, we decline to address OCC's third proposition of law. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, at ¶ 44-49.

**F. Whether the commission approved the Government Directive Recovery Rider in violation of commission precedent:**

**OMAEG Proposition of Law No. 10**

{¶ 42} OMAEG claims that the commission departed from its own precedent without sufficient explanation when it approved the placeholder Government Directive Recovery Rider. OMAEG maintains that in a prior ESP proceeding the commission rejected a placeholder rider that recovered the same type of government-mandated costs. *See In re Application of Ohio Power Company*, Pub. Util. Comm. No. 13-2385-EL-SSO (Feb. 25, 2015), at ¶ 59-62.

{¶ 43} Contrary to OMAEG's assertion, the commission explained that the Government Directive Recovery Rider is different because in the prior ESP case AEP Ohio had an existing mechanism to recover government-mandated costs. In contrast, FirstEnergy is operating under an eight-year base distribution rate freeze, so the Government Directive Recovery Rider was approved as the mechanism to allow for recovery of any future government mandated costs. In sum, the commission adequately explained why it did not follow the case cited by OMAEG. As this is the only basis upon which OMAEG attacks the rider, we reject OMAEG's tenth proposition of law. *See In re Application of Columbus S. Power Co.* at ¶ 50-54.

**G. Whether the commission's approval of the Delivery Capital Recovery Rider lacked record support:**

**OMAEG Proposition of Law No. 9**

{¶ 44} OMAEG challenges the commission's decision to approve the Delivery Capital Recovery Rider as part of the ESP. The Delivery Capital Recovery Rider allows the companies to accelerate the recovery of distribution investments when compared to recovery through a distribution-base-rate case.

{¶ 45} OMAEG first claims that the commission erred when it approved the Delivery Capital Recovery Rider without record support in violation of R.C.

4903.09. But OMAEG overlooks that the commission *did* cite evidence to support the approval of the Delivery Capital Recovery Rider. Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 248-250 (Oct. 12, 2016).

{¶ 46} OMAEG also claims that the commission allowed the companies to recover through this rider the costs associated with general maintenance of the distribution system, as opposed to only capital investments. OMAEG claims this is error because general-maintenance expenses can be recovered only through a distribution-rate case, not through a distribution rider in an ESP proceeding. OMAEG, however, cites no evidence that the companies are recovering general-maintenance expenses under the Delivery Capital Recovery Rider. OMAEG cites the direct testimony of OCC witness James Williams, but Williams never testified to this. Instead, Williams testified that the Delivery Capital Recovery Rider recovers no distribution-maintenance or operation expenses. Accordingly we reject OMAEG's argument.

**H. Whether the decision to allow FirstEnergy to recover lost distribution revenues under the Customer Action Program violated R.C. 4928.66(D): Environmental Groups Proposition of Law No. 4**

{¶ 47} The Environmental Groups argue that the commission violated R.C. 4928.66(D), which authorizes the "recovery of revenue that otherwise may be foregone by the utility as a result of or in connection with the implementation by the electric distribution utility of any energy efficiency or energy conservation programs." According to the Environmental Groups, FirstEnergy measured energy saved by the conservation actions of consumers rather than from FirstEnergy's own conservation programs. The Environmental Groups maintain FirstEnergy cannot recover lost distribution revenues under R.C. 4928.66(D) because the revenues were not lost as a result of any programs implemented by FirstEnergy.

{¶ 48} The Environmental Groups, however, never alleged in an application for rehearing that the commission violated R.C. 4928.66(D) by

allowing FirstEnergy to recover lost distribution revenue under this program. It is well settled that setting forth specific grounds for rehearing is a jurisdictional prerequisite for our review. *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247, 638 N.E.2d 550 (1994); *Akron v. Pub. Util. Comm.*, 55 Ohio St.2d 155, 161-162, 378 N.E.2d 480 (1978). Moreover, we have strictly construed the specificity test set forth in R.C. 4903.10. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59. Because the Environmental Groups failed to specifically allege a violation of R.C. 4928.66(D) on rehearing, we lack jurisdiction to consider the argument now.

{¶ 49} The Environmental Groups further contend that the commission violated R.C. 4903.09 when it offered no reason on rehearing why lost distribution revenues for the Customer Action Program are justified under R.C. 4928.66(D). Although it is true that R.C. 4903.09 requires the commission to explain its decisions, the Environmental Groups' failure to specifically allege error under R.C. 4928.66(D) in an application for rehearing left the commission with nothing to explain.

## I. Whether the commission erred when it approved Rider RRS:
## OMAEG Propositions of Law Nos. 1 and 2

{¶ 50} OMAEG argues in its first proposition of law that the commission erred when it approved Rider RRS in the ESP Order. In its second proposition of law, OMAEG challenges the commission's approval of tariffs implementing Rider RRS.

{¶ 51} We decline to decide these issues. Although the commission originally approved Rider RRS in the ESP Order, it later eliminated the rider on rehearing and directed the companies to file compliance tariffs removing the rider from their rate schedules. Because Rider RRS is no longer part of the ESP, the arguments challenging it are moot. *See Cincinnati Gas & Elec. Co. v. Pub. Util.*

18

*Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 15-18. Therefore, OMAEG's first and second propositions of law are rejected.

**J. Whether the commission violated R.C. 4903.10 when it considered FirstEnergy's modified Rider RRS proposal and other alternatives on rehearing:**

**OMAEG Proposition of Law No. 3**

**{¶ 52}** As a final matter, OMAEG claims that the commission violated R.C. 4903.10 when it granted rehearing to consider FirstEnergy's proposed changes to Rider RRS. We reject OMAEG's arguments for lack of merit.

**{¶ 53}** First, OMAEG claims that the commission erred because FirstEnergy's application for rehearing did not specifically allege in what respect Rider RRS was unlawful or unreasonable as required by R.C. 4903.10. On rehearing, FirstEnergy challenged the commission's modifications to Rider RRS that were made in the ESP Order and offered alternative modifications to Rider RRS in response to those modifications. According to OMAEG, because FirstEnergy failed to set forth specifically the grounds on which the ESP was unlawful and unreasonable, the commission was required to deny the rehearing application and compel the companies to open a new ESP filing to introduce the modified Rider RRS proposal. In turn, OMAEG argues that because the commission did not have jurisdiction to consider Rider RRS on rehearing, it did not have authority to approve the DMR.

**{¶ 54}** Contrary to OMAEG's assertions, FirstEnergy did set forth specific grounds on which the commission erred in modifying Rider RRS in the ESP Order. For instance, FirstEnergy alleged that the modifications to the original Rider RRS proposal improperly prohibited the recovery of certain costs of the rider, thereby increasing the companies' risk. The companies objected to the risk transfer as unreasonable, unsupported by the record, and upsetting the balance of interests supporting the ESP stipulation. FirstEnergy also alleged that Rider RRS had been

rendered unreasonable by a recent FERC order that required a review of the power-purchase agreements underlying Rider RRS.

{¶ 55} Second, OMAEG maintains that the commission violated R.C. 4903.10(B) when it allowed FirstEnergy to introduce new evidence on rehearing in support of its alternative Rider RRS proposal. R.C. 4903.10(B) allows the commission to take additional evidence on rehearing, but only if the evidence "with reasonable diligence, could [not] have been offered upon the original hearing." OMAEG asserts that nothing precluded FirstEnergy from offering this new evidence during the original hearing. But as noted, the commission modified Rider RRS on rehearing, which is what prompted FirstEnergy to introduce evidence to support its alternative Rider RRS proposal. Notwithstanding, OMAEG argues that it was prejudiced by having to expend additional time and resources to respond to the alternative Rider RRS proposals on rehearing. But OMAEG overlooks that it would have had to expend additional time and resources if the commission had opened up a new ESP case, which is what OMAEG claims the commission should have done instead of considering the modified Rider RRS proposal on rehearing. Therefore, we reject OMAEG's third proposition of law.

## IV.    Conclusion

{¶ 56} For the foregoing reasons, we affirm the commission's order in part and reverse in part. On remand, the commission is instructed to immediately remove the DMR from the ESP.

Order affirmed in part<br>
and reversed in part,<br>
and cause remanded.

FRENCH and STEWART, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion.

KENNEDY, J., dissents, with an opinion.

FISCHER, J., dissents, with an opinion joined by O'CONNOR, C.J.

_____

**DEWINE, J., concurring in judgment only.**

{¶ 57} I agree with the plurality that the distribution modernization rider ("DMR") at issue in this case is not an incentive and hence is not authorized under R.C. 4928.143(B)(2)(h). I write separately to explain that this result is reached simply by affording the word "incentive" its commonly understood meaning.

*We should not give deference to PUCO's interpretation of "incentive"*

{¶ 58} This case turns on the meaning of the word incentive. In the view of the Public Utilities Commission of Ohio ("PUCO"), the DMR constitutes an incentive for grid modernization because improving the financial health of FirstEnergy would place FirstEnergy in a position where it could more readily obtain capital that might be used to modernize its grid. To reach this determination, PUCO relied upon a definition of the word incentive as " 'something that stimulates one to take action, work harder, etc.; stimulus; encouragement.' " Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 190 (Oct. 12, 2016), quoting *Webster's New World Dictionary* 682 (3d College Ed.1988). It concluded that the DMR "is intended to stimulate the Companies to focus their innovation and resources on modernizing their distribution systems" and that, therefore, the DMR constitutes an incentive. *Id.*

{¶ 59} The challengers in this case argue that PUCO misconstrued the meaning of the word incentive and that simply providing more money to FirstEnergy did not constitute an incentive for it to modernize its grid. Before we can answer the question of whether the DMR constitutes an incentive, it is necessary to determine what weight we should give to PUCO's interpretation.

{¶ 60} The FirstEnergy companies contend that PUCO's understanding of the DMR as an incentive " 'is entitled to deference as an interpretation of a rate-related statutory provision,' " quoting *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 29. The plurality accepts this

premise, saying "we generally defer to the commission's interpretations on rate-related statutory provisions, but only if they are reasonable." Plurality opinion at ¶ 19, citing *In re Application of Columbus S. Power Co.* at ¶ 29. Thus, under the plurality's mode of analysis we start with PUCO's reading of the term incentive and ask if that reading is reasonable. If we think that PUCO's interpretation is reasonable, then we must defer to it even if we think another interpretation is better supported by the statutory text.[3]

{¶ 61} As I've mentioned before, I'm skeptical of our deference doctrines generally and think the court ought to take a hard look at those doctrines in an appropriate case. *See, e.g.*, *State ex rel. McCann v. Delaware Cty. Bd. of Elections*, 155 Ohio St.3d 14, 2018-Ohio-3342, 118 N.E.3d 224, ¶ 34 (DeWine, J., concurring in judgment only). But even without such a wholesale examination, it is clear to me that we ought not defer to PUCO's interpretation in this case.

{¶ 62} The principal practical arguments for deferring to an agency interpretation revolve around the specialized expertise that administrative agencies are sometimes thought to possess. *See Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-652, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). But here, the question revolves around the meaning of a widely used and commonly understood word. No particular expertise is required to understand what an incentive is, and nothing about the surrounding statutory context raises any doubt that the word is being used in its ordinary sense. In such a case, if a court is to do

---

[3] Whether we accept the invitation to defer to PUCO's interpretation is not simply an academic question in this case. As I explain below, I conclude that under the ordinary meaning of the term, the DMR does not constitute an incentive. But it is not obvious that PUCO's interpretation is wholly unreasonable. Because I think the ordinary meaning of the word should prevail, I do not address the reasonableness of PUCO's interpretation.

its duty and give effect to the legislature's intent as expressed in the statute's text, it must first look to the ordinary meaning of the statute's words.

{¶ 63} Thus, rather than accepting PUCO's interpretation of the word incentive and asking whether it is reasonable, I start my analysis without any deference to PUCO's interpretation. The question is simply whether the DMR constitutes an incentive under the plain and ordinary meaning of that word. I conclude that it does not.

*The DMR is not an incentive*

{¶ 64} As the word is commonly used, something is an incentive to perform an act only if it would push a party toward performing that act. As the plurality rightly notes, there are no meaningful conditions on FirstEnergy's access to the DMR funds, nor does the DMR in any way push FirstEnergy to spend the additional money on grid modernization as opposed to using the funds in some other way. Hence the DMR cannot be a distribution infrastructure and modernization incentive because it in no way incents the company to modernize or improve its distribution infrastructure.

{¶ 65} In concluding that the DMR constitutes an incentive, PUCO relied upon the dictionary definition cited above, and based on that definition it equated the word incentive with the word stimulus. It found the DMR to be an incentive because improving FirstEnergy's financial situation would "stimulate the Companies to focus their innovation and resources on modernizing their distribution systems," Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 190 (Oct. 12, 2016).

{¶ 66} By predicating its analysis solely on a single word in a definition from a single dictionary, PUCO provides a good example of how dictionaries can be misused. Except in cases where words have specialized or technical meanings, when interpreting a statute one must look to how words are typically used by ordinary speakers of the English language. *See Great Lakes Bar Control, Inc. v.*

*Testa*, __ Ohio St.3d __, 2018-Ohio-5207, __ N.E.3d __, ¶ 9-10.  This is because the ordinary meaning of a word is not just any meaning that might be supported by some dictionary definition or other but rather what that word ordinarily connotes. *See Smith v. United States*, 508 U.S. 223, 242, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (Scalia, J., dissenting).  By failing to take stock of how words are actually used, one runs the risk of making a " 'fortress out of the dictionary,' " and thereby achieving results that are contrary to the intent of the legislature as expressed in the statutory text.  *See United States v. Costello*, 666 F.3d 1040, 1043– 44 (7th Cir.2012), quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).

{¶ 67} Here, PUCO appears to be playing the old dictionary definition matching game.  According to the rules of that game, one chooses a single definition or part of a definition.  Then one squints at the chosen words in isolation until one's sense of the colloquial use of language is sufficiently dulled, and one concludes that the matter at hand could (just maybe) be covered by that definition.  From this, a player of the game leaps to the conclusion that this is what the statute means.

{¶ 68} Instead of playing this game, one should stop and take stock of how the word or words are actually used by ordinary speakers of the English language.  And it should be plain that an incentive cannot be anything that might stimulate an outcome.  Rather, it must direct and motivate a party toward that outcome.  Indeed, this goal-directed requirement is evident in the definitions picked out by one of the dissents.  Among those definitions are (1) "something that incites or has a tendency to incite *to determination or action*," (2) "a motive or spur," and (3) "serving to encourage, rouse, or move to action : STIMULATIVE : motivative *in a particular direction or course*."  (Capitalization sic and emphasis added.)  *Webster's Third New International Dictionary* 1141 (2002).  That dissent suggests that nothing in these definitions requires an incentive "to be conditioned or restricted or even related to the action being encouraged."  Dissenting opinion of Kennedy, J., at

¶ 82. But that can't be right. If an incentive must motivate the company in a *particular direction or course*, it must be related to that direction or course.

{¶ 69} In mistakenly treating "incentive" and "stimulus" as interchangeable, PUCO failed to realize that there are a great many things that we might properly describe as a stimulus but which we would not call an incentive. Sunlight might stimulate plant growth, but we would not say sunlight is an incentive for plant growth. A cut to base tax rates might stimulate economic development, but we would not call the tax cut an incentive for economic development. And while a cringe-worthy joke might stimulate a groan, it's not an incentive for anything. The problem with PUCO's treating incentive as interchangeable with stimulus is that the word stimulus can be used to describe anything that might have an effect on a system. But an incentive is understood more narrowly, as something that affects a system in a particular way—by motivating and directing a party toward a certain course of action. Where PUCO and both dissents err is in failing to distinguish between something that might make an outcome more likely and something that serves as an incentive—that is, something that directs and motivates a party toward an outcome.

{¶ 70} Given how the word incentive is ordinarily used, it is no surprise that in other contexts an incentive must be related to a desired act so as to direct and motivate a party to perform it. For instance, under Federal Energy Regulation Commission policy, an incentive program must be prospective and there "must be a connection between the incentive and the conduct meant to be induced," *California Pub. Util. Comm. v. Fed. Energy Regulatory Comm.*, 879 F.3d 966, 977 (9th Cir.2018). For an incentive plan to be prospective, it must be conditioned on some future behavior. A payment of money without any conditions related to future acts is not prospective and lacks any connection with the conduct meant to be induced.

**{¶ 71}** In sum, something cannot be an incentive if it does not direct the utility toward a particular desired outcome. Merely giving the utility more money does nothing to direct it toward improving its infrastructure, even if the utility might choose to use the money in that way. With extra money, a utility might increase employee salaries, pay its investors a higher dividend, redecorate its offices, or perhaps, modernize its infrastructure. But because the DMR does not place any meaningful constraints on the money, it does not direct the utility toward infrastructure improvements rather than any of these other things. And the fact that the utility may not be able to do any of these things without the extra money does not change this analysis; more money, in and of itself, does not motivate the utility to do any particular thing at all.

**{¶ 72}** In contrast, if the money had conditions—if the company had to pay it back if it were not used for grid modernization or if the company only got the money after it started a modernization project—then the DMR would count as an incentive. It would do so, because it would guide the utility toward a particular course of action. But here the DMR does nothing to motivate the utility to spend the additional funds to improve its infrastructure or modernize its grid. It is, therefore, not a distribution infrastructure and modernization *incentive* under any plausible understanding of that phrase. R.C. 4928.143(B)(2)(h) allows for "provisions regarding distribution infrastructure and modernization incentives"— that is, programs that direct and motivate a utility to modernize or improve its infrastructure. The DMR is no such thing.

**{¶ 73}** I agree with the plurality's resolution of the remaining propositions of law set forth in sections III.B through III.J of the plurality opinion.

—————————————

**KENNEDY, J., dissenting.**

**{¶ 74}** It may be true, as one member of our court has remarked, that "R.C. Chapter 4928 is a labyrinthian scheme that governs Ohio's retail electric service,"

26

*In re Application of Columbus S. Power Co.*, 147 Ohio St.3d 439, 2016-Ohio-1608, 67 N.E.3d 734, ¶ 72 (O'Connor, C.J., concurring in part and dissenting in part). This case, however, presents only a straightforward question of statutory interpretation: does R.C. 4928.143(B)(2)(h) permit inclusion of the Distribution Modernization Rider ("DMR") in the electric-security plan for the FirstEnergy Companies?

{¶ 75} The answer is yes. R.C. 4928.143(B)(2)(h) provides that an electric-security plan may include provisions regarding the utility's distribution service, including distribution infrastructure and modernization incentives for the utility. The DMR is a provision that relates to the utility's distribution service, and because it is designed to encourage and enable FirstEnergy Companies (Ohio Edison Company, The Cleveland Electric Illuminating Company, and The Toledo Edison Company) (collectively "FirstEnergy" or the "companies") to modernize its electrical grid, it is a distribution infrastructure and modernization incentive. Further, nothing in R.C. 4928.143(B)(2)(h) requires the commission to impose any conditions or restrictions on an incentive in order for it to be included in the electric-security plan.

{¶ 76} For these reasons, the commission did not act unlawfully or unreasonably in including the DMR in FirstEnergy's electric-security plan, and I would affirm its decision.

### R.C. 4928.143(B)(2)(h)

{¶ 77} R.C. 4928.143(B)(2) provides that an electric-security plan

> may provide for or include, without limitation, * * *
> * * *
> (h) Provisions regarding the utility's distribution service, including, without limitation and notwithstanding any provision of Title XLIX of the Revised Code to the contrary, * * * *provisions*

*regarding distribution infrastructure and modernization incentives for the electric distribution utility.* * * * As part of its determination as to whether to allow in an electric distribution utility's electric security plan inclusion of any provision described in division (B)(2)(h) of this section, the commission shall examine the reliability of the electric distribution utility's distribution system and ensure that customers' and the electric distribution utility's expectations are aligned and that the electric distribution utility is placing sufficient emphasis on and dedicating sufficient resources to the reliability of its distribution system.

(Emphasis added.)

{¶ 78} In construing this statute, our duty is to determine and give effect to the intent of the General Assembly as expressed in the language it enacted. *Griffith v. Aultman Hosp.*, 146 Ohio St.3d 196, 2016-Ohio-1138, 54 N.E.3d 1196, ¶ 18, 23; *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 20. R.C. 1.42 guides our analysis, providing that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." In conducting this analysis, a court may not add or delete words. *In re Application of Ohio Power Co.*, 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, ¶ 24. Rather, " '[t]he preeminent canon of statutory interpretation requires us to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." ' " *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 27, quoting *BedRoc Ltd., L.L.C. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004), quoting *Connecticut Natl. Bank v. Germain*, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). And if the language of the statute is clear and unambiguous, then we must apply it as written, *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d

1210, ¶ 14, and may not rewrite it in the guise of statutory interpretation, *Doe v. Marlington Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 12, 2009-Ohio-1360, 907 N.E.2d 706, ¶ 29.

{¶ 79} The plurality concludes that "[a]n incentive generally serves to induce someone to take some action that otherwise would not be taken but for the incentive." Plurality opinion at ¶ 16. It asserts that the DMR is not an incentive because it lacks "real requirements, restrictions, or conditions," *id*. at ¶ 19, and it suggests that an incentive must include "rewards and penalties that link utility revenues to various standards or goals," *id*. at ¶ 17. However, these requirements do not appear in the statute. Our role is to apply the statute as enacted by the General Assembly, the sole arbiter of public policy in this state. We may not read words into the statute that the legislature could have written. After all, the judiciary's function is to say what the law is, not what it should be.

{¶ 80} Moreover, the only authority cited in support of the plurality's view is the decision of a single federal district court construing the meaning of an incentive program incorporated in a car-dealer franchise agreement, a *contract* that included express conditions for receiving a bonus. *See Len Stoler, Inc. v. Volkswagen Group of America, Inc.*, 232 F.Supp.3d 813, 817 (E.D.Va.2017).

{¶ 81} The plurality's analysis runs counter to the plain language of the statute. First, R.C. 4928.143(B)(2)(h) permits the electric-security plan to include any "[p]rovisions regarding the utility's distribution service." The commission expressly found that the DMR relates to FirstEnergy's distribution service (rather than generation). It explained that there was "a demonstrated need for credit support for the [FirstEnergy] Companies in order to ensure that the Companies have access to capital markets in order to make investments in their distribution system." Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 185 (Oct. 12, 2016). The DMR seeks to satisfy this need by imposing a charge on customers of FirstEnergy's distribution service in order to enable the utility to maintain and

modernize that service. The DMR is therefore directly related to FirstEnergy's distribution services.

**{¶ 82}** Second, the word "incentive" is broader than a promise of compensation in exchange for action. The word "incentive" means "something that incites or has a tendency to incite to determination or action." *Webster's Third New International Dictionary* 1141 (2002). It also means "a motive or spur," "INDUCEMENT," and "serving to encourage, rouse, or move to action : STIMULATIVE : motivative in a particular direction or course." (Capitalization sic.) *Id.* Nothing prohibits the offer of an incentive when there might be a preexisting duty to perform, because parties are free to create incentives to perform the act sooner or with more fervor or to prevent nonperformance. Nor does the definition of "incentive" indicate that an incentive has to be conditioned or restricted or even related to the action being encouraged. Rather, an incentive only has to tend to encourage or spur performance. Therefore, a provision in an electric-security plan is a distribution infrastructure and modernization incentive if it tends to encourage or spur the electric distribution utility to modernize its distribution infrastructure.

**{¶ 83}** The commission found the DMR to advance the policy of this state to encourage innovation and market access for cost-effective retail electric service, including the use of smart grid programs and implementation of advanced metering infrastructure, by encouraging and enabling FirstEnergy to modernize its grid. *See* R.C. 4928.02(D). The commission also found that "the record demonstrates that Rider DMR is intended to stimulate the Companies to focus their innovation and resources on modernizing their distribution systems." Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 190 (Oct. 12, 2016). The rider, the commission pointed out, is needed to allow FirstEnergy to access credit markets to obtain the funds to jump-start grid modernization, while a downgrade in its investment rating could lead to a reduction in funds available for modernization, jeopardizing those efforts. Essentially, the commission examined FirstEnergy's

financial situation and found that without the DMR, grid modernization might not occur. It then decided to provide the rider as an incentive to spur and speed up the utility's efforts to modernize the grid. The DMR therefore gives FirstEnergy an incentive to modernize its grid by providing the support needed to make it possible.

{¶ 84} Further, R.C. 4928.143(B)(2)(h) is devoid of language conditioning payment of a distribution infrastructure and modernization incentive on any particular action by the utility. Contrary to the plurality's premise, implementation of a distribution infrastructure and modernization incentive under R.C. 4928.143(B)(2)(h) does not require the commission to impose directives, timelines, or penalties related to the receipt of the incentive payments. Nor does the statute preclude the payment of an incentive that would "provide additional revenue beyond what the companies would recover for modernizing their distribution systems." Plurality opinion at ¶ 18. And the statute does not prohibit payment of a distribution infrastructure and modernization incentive "up front before any infrastructure-improvement projects were undertaken or completed." Plurality opinion at ¶ 18.

{¶ 85} Rather than dictating any specific conditions on the form that an incentive may take, R.C. 4928.143(B)(2)(h) broadly authorizes an electric-security plan to include a provision regarding a distribution infrastructure and modernization incentive "without limitation and notwithstanding any provision of Title XLIX of the Revised Code to the contrary." The only requirement of the commission included in R.C. 4928.143(B)(2)(h) is that it "shall examine the reliability of the electric distribution utility's distribution system and ensure that customers' and the electric distribution utility's expectations are aligned and that the electric distribution utility is placing sufficient emphasis on and dedicating sufficient resources to the reliability of its distribution system," *id*. The commission satisfied that requirement when it found that "Staff has completed an examination of the reliability of the Companies' distribution system and ensured that the

customers' and the Companies' expectations are aligned." Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 191 (Oct. 12, 2016).

{¶ 86} The plurality faults the commission for "point[ing] to nothing in the record that demonstrates how this cash infusion incentivizes FirstEnergy to accomplish [the] goal" of grid modernization. Plurality opinion at ¶ 18. However, the commission's order pointed to the testimony of Hisham M. Choueiki, Ph.D., P.E., the commission's expert on utility rates, that the DMR "will enable" the companies to obtain funds to "jumpstart" grid modernization. Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 192 (Oct. 12, 2016). Choueiki further testified that the DMR was an incentive designed to speed up the utility's efforts at grid modernization. The commission also cited the testimony of Eileen M. Mikkelsen, the person responsible for rate and regulatory activities for all of FirstEnergy Corp.'s utility subsidiaries, who explained that the DMR would enable the utility to fund significant investments to modernize the distribution system.

{¶ 87} "Our function is not to weigh the evidence or to choose between alternative, fairly debatable rate structures." *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 46 Ohio St.2d 105, 108, 346 N.E.2d 778 (1976). We do not set rates but only ensure that the rates set are not unlawful or unreasonable. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 127 Ohio St.3d 524, 2010-Ohio-6239, 941 N.E.2d 757, ¶ 13. "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). And this court will not reverse the commission's findings "when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *In re Application of*

*Columbus S. Power Co.*, 147 Ohio St.3d 439, 2016-Ohio-1608, 67 N.E.3d 734, ¶ 10.

{¶ 88} Here, the DMR is lawful because it is authorized by R.C. 4928.143(B)(2)(h) as a provision regarding distribution service and as a distribution infrastructure and modernization incentive. And it is reasonable because the commission, after reviewing the evidence, determined that FirstEnergy would not be able to modernize its grid without access to affordable financing, so to prevent higher rates for customers in the future, the commission spurred FirstEnergy's grid-modernization effort by ensuring that financing would be available to pay for it. These findings are not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty, nor are they unreasonable, and the court should not substitute its judgment for the commission's in this matter.

### Conclusion

{¶ 89} Justice Oliver Wendell Holmes Jr. once remarked that "[g]reat cases, like hard cases, make bad law." *N. Secs. Co. v. United States*, 193 U.S. 197, 400, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). And the case before us today is no doubt great and hard—great, because a utility on which numerous Ohio businesses and households depend is at risk of a credit-rating downgrade that would bring with it considerable financial difficulties, and hard, because the means suggested to avert that downgrade—called "credit support" by some and a "bailout" by others—will be borne by ratepayers.

{¶ 90} But no matter how great the case or how hard the facts, our duty here is the same—to interpret and apply the words of the statute. R.C. 4928.143(B)(2)(h) authorizes FirstEnergy's electric-security plan to include a provision relating to its distribution service, including distribution infrastructure and modernization incentives. Acting on that authority and upon review of the evidence presented by the parties, the commission designed the DMR and included it in FirstEnergy's electric-security plan to jump-start investment in grid

modernization. Because that decision is neither unlawful nor unreasonable, I would affirm the commission's decision.

_____

**FISCHER, J., dissenting.**

**{¶ 91}** R.C. 4928.143, which outlines the process for an electric-distribution utility to obtain approval of an electric-security plan ("ESP"), establishes that an ESP may include "[p]rovisions regarding the utility's distribution service, including, without limitation and notwithstanding any provision of Title XLIX of the Revised Code to the contrary, * * * provisions regarding distribution infrastructure and modernization incentives." R.C. 4928.143(B)(2)(h). In my view, we can resolve the issue presented in this case simply by applying this clear statutory language.

**{¶ 92}** The statute permits the type of rider at issue in this case. The distribution modernization rider ("DMR") relates to the utility's distribution service, and because it is designed to foster modernization of Ohio's electrical grid, it is an incentive for modernization. I would affirm on the bases that the DMR is permissible under R.C. 4928.143 and the Public Utilities Commission of Ohio ("the commission") acted under law and with reason.

**{¶ 93}** We must give effect to the intent of the General Assembly, which is embodied in the statutes of the Revised Code. *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 N.E.3d 903, ¶ 21. When the language of a statute is unambiguous, we must apply it as written. *Id.* at ¶ 23. This court "must give effect to the words used, making neither additions nor deletions from words chosen by the General Assembly." *Id.*, citing *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St. 3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 19, citing *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991).

**{¶ 94}** The plurality opinion is premised upon a conclusion that the DMR does not constitute an incentive under R.C. 4928.143(B)(2)(h). I would conclude

that the commission's finding that the rider is an incentive was neither unlawful nor unreasonable. The word "incentive" is not defined in the statute. An undefined term used in a statute is to be given its common, everyday meaning. *State v. Dorso*, 4 Ohio St.3d 60, 62, 466 N.E.2d 449 (1983); *Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, 928 N.E.2d 695, ¶ 24. It is clear from the statute that the word has a common-sense meaning of inducing an action.

{¶ 95} The commission specifically noted that the DMR relates to distribution service. Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 190 (Oct. 12, 2016). And the commission found that the DMR was added to encourage innovation and modernization to the system. *Id.* Thus, the commission made a determination, supported by evidence, that the DMR induces an action. Based on the language of R.C. 4928.143(B)(2)(h), the commission's findings are neither unlawful or unreasonable.

{¶ 96} Moreover, R.C. 4928.143(B)(2)(h) does not impose any additional requirements related to the receipt of the incentive payments. This broad statute does not prevent an upfront payment of that incentive and it does not specify any conditions or the type of incentive that may be designed. The single requirement found in R.C. 4928.143(B)(2)(h) is for the commission to examine the reliability of the utility and ensure aligned expectations and sufficient resources:

> As part of its determination as to whether to allow in an electric distribution utility's electric security plan inclusion of any provision described in division (B)(2)(h) of this section, the commission shall examine the reliability of the electric distribution utility's distribution system and ensure that customers' and the electric distribution utility's expectations are aligned and that the electric distribution utility is placing sufficient emphasis on and dedicating sufficient resources to the reliability of its distribution system.

*Id.* According to the record, the commission complied with this statutory requirement, as it specifically noted that its staff completed an examination of the reliability of the distribution system and ensured that the relevant expectations are aligned. Pub. Util. Comm. No. 14-1297-EL-SSO, Fifth rehearing entry, ¶ 191 (Oct. 12, 2016).

**{¶ 97}** This court historically has affirmed the commission whenever the record contains probative evidence sufficient to show that the commission did not act against the manifest weight of the evidence. *See Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The applicable statute in this case, R.C. 4928.143(B)(2)(h), specifically authorizes an ESP to include provisions relating to modernization incentives. The commission simply created a rider to do just that. As the commission acted under law by fulfilling and following the applicable statute and acted within reason, I conclude that the record contains probative evidence sufficient to show that the commission did not act against the manifest weight of the evidence, and I would accordingly affirm.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Walter Haverfield, L.L.P., and Mark I. Wallach; and Shannon Fisk, for appellant Sierra Club.

Bruce J. Weston, Consumers' Counsel, Maureen R. Willis and William Michael, Assistant Consumers' Counsel, for appellant Ohio Consumers' Counsel.

Thomas R. Hays, Leslie Kovacik, and John Borell, for appellants Northwest Ohio Aggregation Coalition, City of Maumee, City of Northwood, City of Oregon, City of Perrysburg, City of Toledo, City of Waterville, Lake Township Board of Trustees, Lucas County Board of Commissioners, Perrysburg Township Board of Trustees, Village of Holland, and Village of Ottawa Hills.

Bricker & Eckler, L.L.P., Glenn S. Krassen, and Dane Stinson, for appellant Northeast Ohio Public Energy Council.

Carpenter Lipps & Leland, L.L.P., and Kimberly W. Bojko, for appellant Ohio Manufacturers' Association Energy Group.

Gupta Wessler, P.L.L.C., and Rachel Bloomekatz, for appellants Ohio Environmental Council, Environmental Defense Fund, and Environmental Law & Policy Center.

John Finnigan, for appellant Environmental Defense Fund.

Trent Dougherty and Miranda Leppla, for appellant Ohio Environmental Council.

Madeline Fleisher, for appellant Environmental Law & Policy Center.

Dave Yost, Attorney General, Thomas W. McNamee, William L. Wright, Thomas G. Lindgren, and Steven L. Beeler, Assistant Attorneys General, for appellee, Public Utilities Commission of Ohio.

Calfee, Halter & Griswold, L.L.P., James F. Lang, and N. Trevor Alexander; Jones Day, and Yvette McGee Brown; and Scott J. Castro, for intervening appellees Ohio Edison Company, Cleveland Electric Illuminating Company, and Toledo Edison Company.

Boehm, Kurtz & Lowry, Michael L. Kurtz, and Jody Kyler Cohn, for intervening appellee Ohio Energy Group.

_____